1  RODGER R. COLE (CSB No. 178865)
   rcole@fenwick.com
2  HECTOR J. RIBERA (CSB No. 221511)
   hribera@fenwick.com
3  JOSEPH S. BELICHICK (CSB No. 229371)
   jbelichick@fenwick.com
4  FENWICK & WEST LLP
   Silicon Valley Center
5  801 California Street
   Mountain View, CA  94041
6  Telephone:   (650) 988-8500
   Facsimile:    (650) 938-5200
7
   DAVID L. HAYES (CSB No. 122894)
8  dhayes@fenwick.com
   ILANA S. RUBEL (CSB No. 221517)
9  irubel@fenwick.com
   JENNIFER J. JOHNSON (CSB No. 252897)
10 jjjohnson@fenwick.com
   FENWICK & WEST LLP
11 555 California Street - 12th Floor
   San Francisco, CA  94104
12 Telephone:   (415) 875-2300
   Facsimile:    (415) 281-1350
13
   Attorneys for Plaintiff
14 ACTUATE CORPORATION

15                  UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17                   SAN FRANCISCO DIVISION

18

19 ACTUATE CORPORATION,                 Case No.  CV 09 5892 JCS
   a Delaware corporation
20                                      **MEMORANDUM IN OPPOSITION TO
                    Plaintiff,          IBM'S MOTION TO DISMISS
21                                      ACTUATE'S COMPLAINT**
          v.
22
   INTERNATIONAL BUSINESS
23 MACHINES CORPORATION, a              The Honorable Joseph C. Spero
   Delaware corporation, MRO SOFTWARE,  Courtroom A, 15th Floor
24 INC., a Massachusetts corporation,   Date: April 2, 2010
                                        Time: 9:30 a.m.
25
                    Defendants.
26

27

28

PLAINTIFF ACTUATE'S OPPOSITION TO
MOTION TO DISMISS COMPLAINT                          CASE NO. CV 09 5892 JCS

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF ISSUES TO BE DECIDED ................................................ 3

III.    STATEMENT OF RELEVANT FACTUAL ALLEGATIONS........................ 3

IV.     LEGAL STANDARD......................................................................................... 6

V.      ARGUMENT ...................................................................................................... 7

    A.      ACTUATE'S FRAUDULENT CONCEALMENT CLAIM WAS TIMELY FILED UNDER THE STATUTES OF LIMITATIONS OF BOTH CALIFORNIA AND NEW YORK ....................................................... 7

    B.      ACTUATE'S DMCA CIRCUMVENTION CLAIM IS SUPPORTED BY CASE LAW AND SHOULD NOT BE DISMISSED ............................................ 9

    C.      IBM'S CONTRACT-BASED DISMISSAL RESTS ENTIRELY ON AN IMPROPER CONFLATION OF AN UNDEFINED WORD AND A TERM DEFINED BY THE AGREEMENT  ....................................... 15

    D.      SHOULD THE COURT FIND THAT ACTUATE'S COMPLAINT DOES NOT SATISFY THE REQUIREMENTS OF RULE 12(B)(6), ACTUATE SHOULD BE GRANTED LEAVE TO AMEND ................................................. 20

VI.     CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*321 Studios v. MGM Studios, Inc. et al.*,
307 F. Supp.2d 1085 (N.D. Cal. 2004) ................................................................ 11, 12, 13, 14

*ACS Recovery Services, Inc. v. Kaplan*,
2010 WL 144816 (N.D. Cal. Jan. 11, 2010) .................................................................... 19

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1990)............................................................................... 7, 14, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................ 6

*California Union Ins. Co. v. Am. Diversified Sav. Bank*,
948 F.2d 556 (9th Cir. 1991)................................................................................... 17, 19

*Dupree v. Homan Professional Counseling Centers*,
572 F.3d 1094 (9th Cir. 2009)......................................................................................... 18

*Egilman v. Keller & Heckman, LLP*,
401 F. Supp. 2d 105 (D.D.C. 2005) ................................................................................ 14

*Erickson v. Pardus*,
551 U.S. 89 (2007)........................................................................................................... 6

*Gilligan v. Jamco Develop. Corp.*,
108 F.3d 246 (9th Cir. 1997)............................................................................................ 7

*I.M.S. Inquiry Management Systems, Inc. v. Berkshire Information Systems, Inc.*,
307 F. Supp. 2d 521 (S.D.N.Y. 2004)..................................................................... 10, 13, 14

*JP Morgan Chase v. J.H. Elec. of New York, Inc.*,
2010 WL 190425 (N.Y.A.D. 2 Dep't January 19, 2010)....................................................... 20

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008).......................................................................................... 7

*Microsoft Corp. v. EEE Business Inc. et al.*,
555 F. Supp.2d 1051 (N.D. Cal. 2008) ..................................................................... 12, 13, 14

*Prichard v. 164 Ludlow Corp.*,
854 N.Y.S.2d 53 (N.Y. App. Div. 2008) ........................................................................ 8

*Protech Diamond Tools, Inc. v. Liao*,
2009 U.S. Dist. LEXIS 53382 (N.D. Cal. Jun. 8, 2009) ..................................................... 6

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
2009 WL 3049867 (N.D. Ohio 2009) ............................................................................. 14

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,
971 F.2d 401 (9th Cir.1992)........................................................................................... 7

*Tigue v. Commercial Life Ins. Co.*,
631 N.Y.S.2d 974, 974-975 (1995)............................................................................ 17, 19

*Towantic Energy, L.L.C. v. General Elec. Co.*,
2004 WL 1737254 (N.D. Cal. Aug. 2, 2004).................................................................... 7

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Westmoreland Coal Co. v. Entech, Inc.,*
   794 N.E.2d 667, 670 (N.Y. 2003) ........................................................................ 18


**STATUTES AND RULES**

17 U.S.C. § 1201 et seq.................................................................................**passim**

Cal. Code. Civ. Proc. § 338............................................................................ 3, 7, 8

Cal. Civ. Code § 1641 ............................................................................................ 18

Cal. Civ. Code § 1638 ............................................................................................ 19

Cal. Civ. Code § 1644 ...................................................................................... 17, 19

Cal. Code Civ. Proc. § 1858.................................................................................. 18

Federal Rule of Civil Procedure 8.......................................................................... 7

Federal Rule of Civil Procedure 12(b)(6) ....................................................... 3, 20

Section 213(8) of the New York Civil Practice Law and Rules ...........................**passim**

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

PLAINTIFF ACTUATE'S OPPOSITION TO
MOTION TO DISMISS COMPLAINT

iii

CASE NO. CV 09 5892 JCS

1

## I.   INTRODUCTION

2          Beginning in 2000, Plaintiff Actuate Corporation ("Actuate") licensed certain of its

3   software to Defendant MRO Software, Inc. ("MRO") on an "all you can eat" basis.  To ensure

4   fair commercial terms and to appropriately value Actuate's software, it was critical for Actuate to

5   understand the anticipated scope of distribution of its software by MRO.  In 2006, Actuate and

6   MRO negotiated an extension of the governing license agreement, and the price negotiated was

7   based on MRO representatives' specific and express representations that it expected the

8   distribution of Actuate software to decline.  Unbeknownst to Actuate, at the same time it was

9   negotiating an extension with MRO, MRO was negotiating to be acquired by Defendant

10   International Business Machines Corporation ("IBM").  After the acquisition, IBM's distribution

11   of Actuate software was much higher than represented by MRO representatives.  Yet IBM refuses

12   to address the fraudulent misrepresentations made by representatives of its subsidiary or provide

13   Actuate with information to understand the amount IBM should be paying under the royalty

14   provisions of the governing license.  And in utter disregard of Actuate's intellectual property

15   rights, IBM posted on its website Actuate's software and the license keys necessary to download

16   and use that software for anyone in the world to freely download and redistribute.

17          Defendants IBM and MRO's (collectively "Defendants," or "IBM") Motion to Dismiss

18   ("Motion" or "MTD") continues IBM's stance of failing to redress the wrongs it has committed

19   against Actuate.  The foundations of IBM's Motion, for each of the three claims they seek to

20   dismiss, are demonstrably incorrect statements about the law and the underlying contract at issue.

21   A careful reading readily exposes IBM's Motion as a groundless infliction of unnecessary legal

22   expense upon Actuate and a waste of valuable judicial resources.

23          To begin, IBM's contention that Actuate's fraud claim is time-barred is premised on a

24   bald misstatement of the law.  IBM asserts that New York law applies, and that Actuate's claim

25   for fraudulent concealment is barred by New York's purported two year statute of limitations.

26   But even if one accepts IBM's choice of law argument, **New York does not have a two year**

27   **statute of limitations for fraud claims.**  IBM correctly identifies Section 213(8) of the New

28   York Civil Practice Law and Rules as the governing statute of limitations should New York law

Fenwick & West LLP
Attorneys At Law
Mountain View

1   apply.  Section 213(8) provides that the time within which an action for fraud must be

2   commenced is "**the greater of** six years from the date the cause of action accrued or two years

3   from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or

4   could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8) (emphasis added).

5   In its Motion to Dismiss, IBM failed to quote the first half of the statute reflecting the

6   applicability of a six year filing window (which would comfortably allow for Actuate's claim

7   here), selectively quoting only the fragment that references an inapplicable two year alternative

8   limit.  Setting aside IBM's misrepresentation of the statute, the Motion contains no accurate legal

9   basis upon which to dismiss Actuate's fraudulent concealment claim.

10          IBM similarly misstates the law with respect to Actuate's "circumvention of access

11   controls" claim brought under the Digital Millennium Copyright Act (DMCA).  The DMCA

12   contains separate provisions that respectively prohibit direct circumvention of a protection

13   measure, and "trafficking" of technologies that circumvent a protection measure.  Actuate has

14   alleged conduct by IBM that violates the <u>anti-trafficking</u> provisions of the DMCA, but IBM has

15   only put forth inapposite case law pertaining to the <u>direct</u> circumvention provisions.  When one

16   considers the case law that is actually squarely on point – cases that are notably absent from

17   IBM's Motion – IBM's argument crumbles.  Both Judge Illston and Judge White have addressed

18   precisely the scenario at issue here, and both have held that unauthorized distribution of an issued

19   license key does give rise to DMCA circumvention liability under the anti-trafficking provisions.

20   IBM's proclamation that "[i]n every case to have considered the matter, courts have held that

21   improper use of a password issued by a copyright holder" is simply not true.  Setting aside IBM's

22   misapplication of the case law interpreting the DMCA, the Motion contains no accurate basis for

23   the dismissal of Actuate's circumvention claim.

24          Finally, not content to merely invent a new statute of limitations and a non-existent legal

25   "consensus" as to DMCA claims, IBM attacks Actuate's breach of contract claim by inserting a

26   defined term in a critical section of the contract when that defined term is not used in the relevant

27   section.  IBM's Motion to Dismiss Actuate's breach of contract claim rests upon the assumption

28   that the defined term "Limited Use" is used in the pivotal provision addressing IBM's post-

Fenwick & West LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  acquisition distribution rights and payment obligations.  It is not.  The provision at issue contains

2  only the undefined term "Limited," but in its Motion, IBM swaps in the unrelated, defined term

3  "Limited Use."  By fudging the terms in this manner, IBM evidently hopes to convince the Court

4  that a provision which, as written, limits IBM's distribution of Actuate's software to "Partner

5  Products" and their "Natural Successors," instead provides IBM virtually boundless rights to

6  distribute Actuate software without paying.  As with its first two dismissal arguments, this one

7  also soon collapses when the faulty underpinnings are exposed.

8       IBM has not presented a valid basis for dismissal of any of Actuate's claims, and its

9  Motion should be denied in its entirety.

10  **II.     STATEMENT OF ISSUES TO BE DECIDED**

11       **A.**     Whether Actuate's claim for fraudulent concealment is barred by the relevant

12  statute of limitations.  N.Y. C.P.L.R. § 213(8); Cal. Code. Civ. Proc. § 338.

13       **B.**     Whether Actuate's claim that IBM and MRO violated the DMCA by posting

14  Actuate's restricted license keys on IBM's website without Actuate's authorization alleges a

15  violation of the DMCA prohibition against unauthorized distribution of technology or devices

16  whose primary purpose is circumvention of technological measures that effectively protect a

17  copyrighted work.  17 U.S.C. § 1201 et seq.

18       **C.**     Whether Actuate's breach of contract allegations against IBM and its predecessor

19  MRO state a claim sufficient to survive IBM's motion to dismiss pursuant to Federal Rule of

20  Civil Procedure 12(b)(6).

21  **III.    STATEMENT OF RELEVANT FACTUAL ALLEGATIONS**

22       Actuate's Complaint seeks relief from IBM and its predecessor-in-interest MRO for

23  fraudulent concealment, circumvention of copyright protection systems, breach of contract, and

24  copyright infringement.  IBM has moved to dismiss the first three of these claims.

25  ***Actuate's Fraudulent Concealment Claim***

26       As alleged in the Complaint, in December 2000, Actuate and MRO entered into a license

27  agreement ("License Agreement") that authorized MRO to distribute an unlimited number of

28  copies of certain specified Actuate software, provided the conditions of the license were met.  It

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   was not typical for Actuate to enter into this type of "all you can eat" license; Actuate would

2   generally enter into licenses that provide for payment on a per-copy-distributed basis.  Of

3   paramount importance in Actuate's decision to enter into this unlimited distribution license was

4   the expected scope of distribution in light of the size of MRO's customer base.  Compl. ¶ 20.

5        In 2006, as the expiration of the License Agreement drew near, Actuate and MRO

6   engaged in a series of discussions regarding the terms upon which the parties' agreement might

7   be extended.  *Id*. ¶ 21.  MRO's agents represented to Actuate in those talks, occurring in May and

8   June of 2006, that MRO expected its distribution of Actuate's software to decline in the future.

9   *Id*.  In reliance on those representations, on June 30, 2006, Actuate agreed to renew the license

10  with MRO on the same "all you can eat" terms, and with a significantly discounted price.  *Id*. ¶

11  22.  Just over a month later, on August 2, 2006, IBM announced that it had acquired MRO and

12  would be distributing the Actuate software on a much more extensive basis in conjunction with

13  IBM products.  *Id*. ¶ 23.

14       In its proxy statements filed with the SEC, IBM revealed that this acquisition had been

15  planned with MRO's executives since May 2006, during the same period that MRO was engaging

16  in discussions with Actuate regarding the extension of the license agreement.  *Id*.  Yet MRO

17  made no mention of its potential acquisition by IBM, nor did MRO inform Actuate that these

18  planned events would lead to a distribution of Actuate software vastly beyond any level that could

19  be reasonably anticipated based on historical distribution levels.  *Id*. ¶ 24.  Actuate would not

20  have agreed to the terms of the June 30, 2006 renewal had it known of the impending IBM

21  acquisition.  *Id*. ¶ 25.  Based on these events, Actuate has alleged that MRO fraudulently

22  concealed its plans to be acquired by IBM, and thereby induced Actuate to enter into an unlimited

23  distribution agreement on terms to which Actuate would not otherwise have agreed.  *Id*. ¶¶ 59-70.

24  ***Actuate's Circumvention Claim Under the DMCA***

25       To protect its copyrighted software, Actuate uses a license key/file system.  An authorized

26  user of Actuate's software obtains a license key/file along with the licensed software package.

27  Depending on the type of copyright license that an end user purchases, the license key/file can

28  enable or disable certain components of the software, and can limit the number of computer

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

processors ("CPUs") and/or operating systems that can run the program.  *Id.* ¶ 14.  The user enters the unique license key/file upon installation to obtain only the quantity and components of the software to which the user is entitled to have access.  *Id.*

Without authorization, at an unknown point in time following its acquisition of MRO, IBM posted

- both the version 7 and then-current version 9 of Actuate's core software product (along with most available optional components) and

- a license key/file enabling installation and use of the Actuate software

on a subpage of IBM's publicly available website — www.ibm.com.

These items were posted without any limit or control on use or re-distribution.  IBM's actions allowed any user of the public Internet to install, use and re-distribute Actuate's valuable, copyrighted and license-protected software on a completely unlimited and stand-alone basis.  *Id.* ¶¶ 32-33.

In or about the beginning of December 2008, Actuate discovered these unauthorized postings, immediately informed IBM of the situation, and demanded redress.  In response, IBM assured Actuate that all of Actuate's software and related materials were no longer posted online.  *Id.* ¶ 35.  Despite IBM's assurances, in May 2009, five months after Actuate had notified IBM of its infringing actions, Actuate found additional copies of its software, development tools and proprietary license keys publicly and freely available on IBM's website for anyone to download, use and redistribute.  *Id.* ¶ 37.

In light of IBM's actions and the harm Actuate has suffered as a result, in addition to a claim for direct and contributory copyright infringement, Actuate has brought a claim, alleging that IBM's unauthorized posting of Actuate's proprietary and confidential license keys constitutes a violation of the DMCA's prohibition against unauthorized distribution of technology or devices whose primary purpose is circumvention of a technological access-restriction and copy-protection measure.  *Id.* ¶ 48-58.

### *Actuate's Breach of Contract Claim*

Exhibit A to the License Agreement, executed in 2000 and amended from time to time,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   contains a provision, Section 9, addressing distribution rights and payment obligations arising in

2   the event of an acquisition of MRO.  This provision states that, following a merger or acquisition,

3   MRO's distribution rights for Actuate software would continue as to MRO's identified products

4   and their "Natural Successors," but as to any other distribution of Actuate software, payment

5   would have to be made to Actuate according to a defined revenue-based formula.  *Id.* ¶ 18;

6   License Agreement Exhibit A, § 9.

7       Following its acquisition of MRO, IBM soon integrated MRO's Maximo product,

8   containing Actuate software, into IBM's widely distributed Tivoli products.  Compl. ¶ 24, 28-29.

9   Actuate has alleged that the Tivoli product does not represent an expansion or Natural Successor

10  of the Maximo product, and that under the License Agreement, Actuate is therefore owed

11  substantial royalties according to the parties' contractually agreed-upon formula.  *Id.* ¶¶ 31, 39-

12  47.

13  ***Agreement of the Parties to Toll any Limitations Periods from June 26, 2009 through***
    ***December 16, 2009***
14

15      As part of discussions to resolve the dispute between the parties (which had been ongoing

16  since approximately early 2008), in June 2009, IBM agreed to toll any limitations periods

17  applicable to the claims identified in the Complaint.  (MTD at 3:14-18; Clouse Decl. ¶ 3.  This

18  tolling agreement was signed within three years of Actuate's August 2006 discovery of IBM and

19  MRO's acquisition plans, and has been renewed so as to be in continuous effect from execution

20  through the filing of Actuate's Complaint on December 16, 2009.  Clouse Decl. ¶ 3.

21  **IV.    LEGAL STANDARD**

22      A complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations

23  as true, it states a claim to relief that is plausible on its face.  *See, e.g. Protech Diamond Tools,*

24  *Inc. v. Liao*, 2009 U.S. Dist. LEXIS 53382, *24 (N.D. Cal. Jun. 8, 2009) (citing *Bell Atl. Corp. v.*

25  *Twombly*, 550 U.S. 544, 570 (2007)).  Specific facts are not necessary; the statement need only

26  give the defendant[s] fair notice of what the claim is and the grounds upon which it rests.  *Id.*,

27  citing *Erickson v. Pardus*, 551 U.S. 89, 92 (2007).  In adjudicating a motion to dismiss, "the

28  inquiry is limited to the allegations in the complaint, which are accepted as true and construed in

the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.  *Balistreri v. Pacifica  Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *see also Gilligan v. Jamco Develop. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim).

If the court finds a pleading deficient, "[l]eave to amend should be granted if it appears at all possible that the plaintiff can correct the defect."  *Balistreri*, 901 F.2d at 701 (internal quotation and citation omitted).

## V.   ARGUMENT

### A.   ACTUATE'S FRAUDULENT CONCEALMENT CLAIM WAS TIMELY FILED UNDER THE STATUTES OF LIMITATIONS OF BOTH CALIFORNIA AND NEW YORK

While Actuate does not concede that New York law would necessarily supply the applicable statute of limitations for Actuate's fraudulent concealment claim, this Court need not address the choice of law issues, as Actuate's claim was brought comfortably within the statute of limitations whether California or New York law applies.[1]

In support of its Motion to Dismiss this claim, IBM cites Section 213(8) of the New York Civil Practice Law and Rules, although IBM notably does not include the relevant provision in its entirety.  That Section reads:

---

[1] This is not a claim arising in contract but in tort, and this Court and the Ninth Circuit have applied the law of the forum state to tort claims such as this, regardless of the contractual choice of law provision. *Towantic Energy, L.L.C. v. General Elec. Co.,* 2004 WL 1737254, *5  (N.D. Cal. Aug. 2, 2004) ("Claims arising in tort are not ordinarily controlled by a contractual choice of law provision.") (citing *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir.1992)).  IBM does not argue that Actuate's fraud claim was filed outside of California's three year statute of limitations for fraud claims.  Cal. Code. Civ. Proc. § 338(d) (action for fraud must be commenced within three years of discovery of the facts constituting the fraud).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1
2
3

[A]n action based upon fraud; the time within which the action must be commenced shall be **the greater of** six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it.

4

N.Y. C.P.L.R. § 213(8) (emphasis added). In its motion, IBM inexplicably cropped out the first

5

half of the statute, and included only the part that references the alternative application of a two-

6

year limit from discovery of the fraud (which applies only should that period be <u>greater</u> than the

7

period measured by six years from accrual). Even the case IBM cites suggesting that the

8

purported two-year statute of limitations applies to fraudulent inducement claims makes clear that

9

the statute of limitations is the greater of six years from the accrual date or two years from the

10

discovery date.

11
12
13
14
15
16

The cause of action for fraudulent inducement with respect to plaintiffs' initial investment in defendant 164 Ludlow Corp. was properly dismissed as barred by the statute of limitations. Plaintiffs entered into the contract to purchase shares in the corporation, i.e., they completed the act that the alleged fraudulent statements had induced, on September 9, 1997. **Accordingly, they had six years from that date, i.e., until September 9, 2003, to commence their action**. The action was not commenced until May 13, 2005. Even assuming the fraud was not discovered until "late 1999," as alleged in the complaint, the claim was time-barred because the action was commenced more than two years from "late 1999."

17

*Prichard v. 164 Ludlow Corp.*, 854 N.Y.S.2d 53, 54 (N.Y. App. Div. 2008) (emphasis added)

18

(internal citations omitted). Here, IBM's alleged concealment occurred in May and June of 2006,

19

so under the law as unambiguously written, Actuate would have until mid-2012, six years from

20

the time of accrual, to bring its fraudulent concealment action. Actuate's December 16, 2009

21

filing easily falls within the allowed period.

22

In the event that California law applies, IBM is equally lacking a valid statute of

23

limitations defense. Actuate has pled facts establishing that the fraud could not have been

24

reasonably discovered until August of 2006. As the statute of limitations was tolled by agreement

25

as of June 2009, less than three years from the time of discoverability, Actuate's fraudulent

26

concealment action also survives California's three-year statute of limitations. Cal. Code. Civ.

27

Proc. § 338.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**B. ACTUATE'S DMCA CIRCUMVENTION CLAIM IS SUPPORTED BY CASE LAW AND SHOULD NOT BE DISMISSED**

Actuate has alleged that IBM acted in contravention of the DMCA (17 U.S.C. § 1201 *et seq.*) when it posted the proprietary license keys to Actuate's copyright-protected software on the Internet without Actuate's authorization. Actuate's license keys are designed to control access to Actuate's software and to protect against unauthorized copying and distribution, but IBM's unauthorized posting of the keys effectively undermined both these protections — enabling anyone accessing IBM's publicly available site to gain unauthorized access to Actuate's protected software and to download and install (*i.e.*, copy) Actuate's programs on an unlimited number of CPUs.

***The DMCA – Direct Circumvention vs. Trafficking Prohibitions***

It is important to note at the outset that Section 1201 of the DMCA contains different sections that address direct versus indirect circumvention. Acts of direct circumvention are prohibited with respect to access controls, but not copy controls. However, indirect acts of circumvention are prohibited with respect to both access controls and copy controls, through distribution or other trafficking in technology or devices primarily designed or marketed for circumvention of such controls. In more specific detail:

- Section 1201(a)(1) prohibits <u>direct</u> circumvention of <u>access controls</u>:

  No person shall circumvent a technological measure that effectively controls access to a work protected under this title.

- Section 1201(a)(2) prohibits <u>trafficking in</u> technology designed to circumvent <u>access controls</u>:

  No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

    (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

    (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively protects a right of a copyright owner under this title; or

    (C) is marketed by that person or another acting in concert with that person with

Fenwick & West LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

• Section 1201(b)(1) prohibits <u>trafficking in</u> technology designed to circumvent <u>copy controls</u>[2]:

No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

IBM's own cited case law notes the distinction between Section 1201(a)(1), which prohibits direct circumvention, and the latter two provisions, Sections 1201(a)(2) and (b)(1) (sometimes called the "anti-trafficking" provisions), which instead prohibit trafficking in technology that circumvents access and copy controls respectively.  *See, e.g. I.M.S. Inquiry Management Systems, Inc. v. Berkshire Information Systems, Inc.*, 307 F. Supp. 2d 521, 531 (S.D.N.Y. 2004).  Yet IBM's Motion reflects no awareness of this distinction.

At issue here are the anti-trafficking provisions of the DMCA.  Actuate has alleged that IBM, without authorization, posted on its public website (*i.e.*, "provided" or "offered to the public") the Actuate license keys (*i.e.*, technology primarily designed to circumvent protection measures that effectively control access and prevent copying of Actuate's software).  Accepted as true, as they must be for purposes of a motion to dismiss, these allegations state a violation of both DMCA anti-trafficking provisions – Sections 1201(a)(2) and (b)(1).  Yet IBM has presented

---

[2] Although the types of controls that are the subject of Section 1201(b)(1) are usually referred to as "copy controls," they include any control that protects any right of a copyright holder – i.e., controls that protect against unauthorized copying, distribution, modification (creation of derivative works), public display, and/or public performance.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    no case law bearing on these provisions, instead solely citing cases from other districts that were

2    decided under the direct circumvention provision, Section 1201(a)(1), that is not at issue here.

3    ***Anti-Trafficking Case Law***

4        IBM's declaration that "[i]n every case to have considered the matter, courts have held

5    that improper use of a password issued by the copyright holder does not amount to

6    'circumvention' of a technological control prohibited under the DMCA" could hardly be more off

7    the mark.  MTD at 5:14-16.

8        First, IBM's reference to "improper use of a password" refers to direct circumvention,

9    which is not at issue here.  Actuate is not alleging that IBM has improperly used Actuate keys to

10    itself gain access to Actuate's software for its own use.

11        Second, this sweeping pronouncement flies in the face of dead-on precedent from this

12    very District that addresses what <u>is</u> at issue here – indirect acts of circumvention through

13    trafficking in technology that enables <u>others</u> to gain unauthorized access and copying of Actuate's

14    software.  Specifically, two Judges in the Northern District have considered the DMCA anti-

15    trafficking provisions in analogous factual situations, and both held the party in IBM's position

16    liable, concluding that the unauthorized distribution of a product key gives rise to DMCA

17    trafficking liability.  While IBM omits these cases from its Motion, they squarely apply here,

18    unlike the Section 1201(a)(1) cases that IBM does cite.

19        In the *321 Studios* case, declaratory judgment plaintiff 321 Studios marketed software and

20    instructions for copying DVDs that contained defendants' copyrighted material.  *321 Studios v.*

21    *MGM Studios, Inc. et al*., 307 F. Supp.2d 1085 (N.D. Cal. 2004).  Certain DVDs are encoded

22    using a "Content Scramble System" (CSS), and in such cases, 321 utilized and its software

23    contained CSS access keys in order to access the data and provide access to customers.  *Id*. at

24    1089.  While these access keys were widely available on the Internet, one could gain lawful

25    access only by entering into a license agreement, which 321 had not done.  *Id*. at 1095.

26        MGM asserted that 321's distribution of the 321 software, which without authorization

27    included CSS access keys, constituted a prohibited trafficking of a circumvention device under

28    both Section 1201(a)(2) and Section 1201 (b)(1) of the DMCA.  *Id*.  321 countered that its actions

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

did not "circumvent" encryption because it was using an authorized key issued by the copyright

holders that was readily available online, and further that because the 321 software contained

features that were capable of other uses, the software was not "primarily designed" for

circumvention as required by the anti-trafficking provisions. *Id*. at 1098. The Northern District

sided with the copyright holder; Judge Illston found that the copyright holder's restriction on use

of the key was an effective protection measure that was circumvented by 321's unauthorized

distribution, notwithstanding the fact that the key was issued by the copyright holder and was

available online:

> However, while 321's software does use the authorized key to access the DVD, it
> does not have authority to use this key, as licensed DVD players do, and it therefore
> avoids and bypasses CSS. For these reasons, § 1201(b)(1) does apply to 321's DVD
> copying software.

The court further rejected 321's "primarily designed defense," finding that the purpose of the

software as a whole was not at issue, but rather its unauthorized use of the CSS key, which was

solely designed to circumvent the CSS. *Id*. at 1098.

The instant case is precisely analogous to *321*; while the Actuate license key may have

been issued by Actuate, Actuate had clearly not authorized posting of it on IBM's publicly

available website, making IBM's actions a public offering of a circumvention technology

designed to protect against both access and copying. And, insofar as IBM should try to argue that

its website is capable of uses other than enablement of unauthorized access and copying of

Actuate software such that the anti-trafficking provisions are not triggered, *321* makes clear that it

is not the website as a whole whose purpose must be assessed, but rather the challenged feature -

the Actuate license key. *Id*. Because the primary purpose of the unauthorized license key is

plainly to bypass the access and copy protections placed on Actuate's software, any such

contention by IBM must fail.

The other Northern District case on point is equally fatal to IBM's cause. In *Microsoft v.

EEE Business*, defendant Alice Wang had, without Microsoft's permission, sold Microsoft

software that was solely available under a Volume License Agreement that permitted only

authorized licensees to enter the confidential license key (a Volume License Key, or VLK) to

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

unlock the program. *Microsoft Corp. v. EEE Business Inc. et al*., 555 F. Supp.2d 1051 (N.D. Cal. 2008). Among other claims, Microsoft brought a DMCA circumvention claim on the grounds that Wang's distribution of the license key in violation of the agreement restriction constituted trafficking of an access-control measure in violation of Section 1201(a)(2) of the DMCA. Judge White agreed with Microsoft that defendant Wang's unauthorized distribution of the license key did in fact constitute a DMCA-prohibited circumvention of a copyright protection system:

> Lastly, among the works defendant Wang sold to Microsoft's outside investigators were software only available under a Volume License Agreement. This agreement permitted only authorized licensees to install software to unlock the media programming to enable the user to enter a 25-character alphanumeric code-the Volume License Key-which is unique to the licensee and required to be kept confidential under the terms of the Volume License Agreement . . . By distributing a VLK without authorization, Wang effectively circumvented Microsoft's technological measure to control access to a copyrighted work in violation of the DCMA. *See* 17 U.S.C. § 1201(a)(2).

*Id*. at 1059 (internal citations omitted). When comparing the instant case to *Microsoft*, IBM's distribution of Actuate's license key was every bit as unauthorized as Wang's distribution of Microsoft's license key, and IBM's actions, if anything, even more substantially undermined the technological copyright protection measures at issue by making Actuate's license key freely available to any Internet user. Like *321*, *Microsoft* confirms that unauthorized distribution of an issued license key gives rise to liability under the DMCA's anti-trafficking provisions.

### IBM's Cited Case Law

The three cases cited by IBM in its Motion to Dismiss are inapplicable to the DMCA anti-trafficking provisions that are at issue here, as in none of these cases were there any trafficking claims. Rather, all three involved claims against a defendant that had itself engaged in acts of <u>direct</u> circumvention, and the issue was whether the use of the plaintiff's license key contravened <u>Section 1201(a)(1)</u> of the DMCA, not Section 1201(a)(2) or Section 1201(b)(1).

In *I.M.S. Inquiry Management Systems, Inc. v. Berkshire Information Systems, Inc.*, 307 F. Supp. 2d 521 (S.D.N.Y. 2004), defendant Berkshire obtained a user identification and password from one of I.M.S.'s customers that allowed Berkshire to access and use I.M.S.'s copyrighted software. Berkshire was accused of engaging in direct circumvention of I.M.S.'s protection systems in violation of Section 1201(a)(1) of the DMCA, and the court there found that Berkshire

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  had not violated that section because it did not bypass, remove, deactivate or impair the

2  technological measure protecting the copyrighted work. *Id*. at 533. However, Berkshire was not

3  alleged to have distributed the protected license key in violation of the DMCA's anti-trafficking

4  provisions, and thus the *I.M.S.* court was silent as to the application of Section 1201(a)(2) and

5  Section 1201(b)(1). Accordingly, this case sheds no light on the instant case.

6  Similarly, IBM's two other cases are decided under the direct circumvention provision,

7  and are not instructive as to anti-trafficking actions. In *R.C. Olmstead, Inc. v. CU Interface, LLC*,

8  2009 WL 3049867 (N.D. Ohio 2009), plaintiff and copyright holder RCO provided user names

9  and passwords enabling RCO software access to its licensee CSE, who then provided them to

10  defendant CUI. The court, relying on *I.M.S. Inquiry Management Systems*, held that CUI did not

11  directly bypass or circumvent any technological measure of the RCO software in contravention of

12  Section 1201(a)(1). But again, no mention of Section 1201(a)(2) or Section 1201(b)(1).

13  Likewise in *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105 (D.D.C. 2005), the court

14  held that the use of a valid username and password does not constitute direct circumvention under

15  Section1201(a)(1), but the DMCA anti-trafficking provisions were not addressed.

16  In sum, it is only by omitting from its analysis the two cases with the most direct

17  precedential bearing, *Microsoft* and *321 Studios*, that IBM can reach its asserted conclusion that

18  Actuate's DMCA claim is barred. Actuate is asserting a DMCA anti-trafficking claim against

19  IBM for posting the license keys that bypassed Actuate's effective copy and access control

20  mechanisms – a claim that is amply supported by case law in this District. As noted above,

21  dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts

22  alleged to support a cognizable legal theory. *Balistreri*, 901 F.2d at 699. Given that the two

23  courts in this jurisdiction that have directly addressed the provisions at issue both support

24  Actuate's DMCA cause of action, and the only cases cited by IBM pertain to an inapplicable

25  provision of the statute, there is clearly a cognizable legal theory on which to proceed. Under

26  these circumstances, dismissal would be improper.

27

28

**C.    IBM'S CONTRACT-BASED DISMISSAL RESTS ENTIRELY ON AN IMPROPER CONFLATION OF AN UNDEFINED WORD AND A TERM DEFINED BY THE AGREEMENT**

IBM's motion to dismiss Actuate's contract claim is based on a subtle yet clearly improper conflation of an undefined word and a term defined by the Agreement.  This maneuver occurs as IBM moves from the second to the third bullet point on the twelfth page of its Motion; IBM quietly substitutes the defined term, "Limited Use," taken from an entirely different context and section of the License Agreement (¶ 1.8), for the undefined term, "Limited," that actually appears in the provision at issue (Section 9 of Exhibit A).[3]  With this inconspicuous exchange of terms, IBM tries to transform a contract that strictly limits IBM's rights to distribute Actuate software (and requires substantial royalty payments to Actuate for non-qualified distribution), into a wholesale give-away arrangement pursuant to which IBM contends it can distribute as much Actuate software as it wishes in virtually any product it wishes without making any additional royalty payments to Actuate.

To grasp the significance of IBM's word swap, one must closely study the pivotal provision addressing post-acquisition distribution rights and obligations of an MRO acquirer (here, IBM).  Section 9 of Exhibit A to the License Agreement contains the provision that addresses distribution rights and payment obligations following an acquisition of MRO.  As it was precisely such an event, IBM's acquisition of MRO in 2006, that Actuate alleges triggered Defendants' unmet obligation to make additional license payments, this provision is one of the key issues in this contract dispute.  The relevant portion of this pivotal provision reads as follows:

**Acquisition or Merger**

Should Partner acquire, merge with or be acquired by a third party during the Term, this Agreement shall remain in full force and effect in accordance with its terms.  However, Partner's use of the Software shall continue to be Limited to Partner's Products and their Natural Successors[4] as stated in this Exhibit A.  Partner may elect

---

[3] IBM's clever arrangement of quotation marks in the second and third bullets of page 12 of its Motion suggests that IBM was in fact fully cognizant that the capitalized word "Limited" in Section 9 was undefined (and most likely a typographical error).  In a desperate attempt to buttress IBM's meritless position, the punctuation in this part of the Motion was deliberately manipulated so as to suggest that the term "Limited Use" appears in Section 9 where it does not in fact appear.  IBM then proceeded through its argument using this necessary but fundamentally wrong premise as a necessary foundation for its argument.
[4] The License Agreement defines certain relevant terms appearing in this section as follows:

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

to extend its rights under this Agreement to use the Actuate Software in connection with the products of such third party by agreeing to pay the incremental License Fees as defined below.

The License Fees due to Actuate during the remainder of the Term and any renewal thereof (or such portion of pre-paid fees as are allocable to such remainder), shall be increased by a percentage equal to the percentage that such third party's Revenue represents relative to Partner's Revenue, for (a) those defined third party's products for which this Agreement should be extended to or (b) those third party products which shall be replaced by Partner's Products, at the time such event occurs. Revenue shall thus be defined as being the revenue for the trailing four fiscal quarters of each party.

By way of example only, should Partner having a Revenue of $100 million acquire a company with $60 million in Revenue, of which $20 million represents the third party products to which this Agreement is to be extended to, then the incremental License Fees due to Actuate would be 20% of the License Fees due to Actuate as defined in Section 5 above. Likewise, should Partner's Products be provided to the end users of third party as a replacement for third party's product, where the third party's product represents $20 million in Revenue, then the incremental License Fees due to Actuate would be 20% of the License Fees due to Actuate as defined in Section 5 above. A similar calculation will used to determine incremental Maintenance Fees.

*See* Declaration of James D. Wade ("Wade Decl."), Ex. A (License Agreement, Exhibit A, Section 9 (page 13 of 55). Note that the word "Limited" appears in the second sentence with a capital "L," but is not defined anywhere in the License Agreement or its exhibits or amendments. *Id.* As capitalized "Limited" appears nowhere else in the agreement, there is no intrinsic reason to believe the capitalization is more than a typo. If IBM wishes to persuade the Court, in the absence of any provided definition within the agreement, that "Limited" means something other than "limited" (lower case "l"), it is welcome to marshal its evidence and make its case as the litigation progresses. However, it is certainly not apparent from anything in the License Agreement itself that there was any intent to deviate from the plain English meaning of the word.

- "Partner" is defined as "Project Software & Development, Inc. (which thereafter changed its name to MRO Software Inc.) and its wholly owned subsidiaries, including MRO.COM." (Preamble of License Agreement)
- "Partner Products" is defined as "the MAXIMO family of products as they exist today (June 30, 2006) and might expand or exist in the future due to internal development and not via product acquisition, and their Natural Successors, so long as such products relate to asset management, service management and/or IT asset management (Amendment No. 4, § 1(b))
- "Natural Successors" is defined as "any replacement or substitute software for any of the Actuate Software products or Partner Products . . . Natural Successors shall include without limitation any software that: (i) includes substantially similar functionality to a Product; (ii) represents a performance or other enhancement to similar functionality offered in a Product; or (iii) offers similar functionality to a Product but that is translated into or supports additional natural languages and platforms. (Section 1.11 of License Agreement)

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   What is apparent from the face of the License Agreement, however, is that the separate

2   defined term, "Limited Use," the linchpin of IBM's entire contract-dismissal argument, appears

3   <u>nowhere</u> in the provision that addresses the "Acquisition or Merger" contingency.[5]   As with its

4   statute of limitations argument, though, IBM was not to be constrained by the document as

5   written.  Evidently perceiving an opportunity in the anomalously capitalized "Limited" (that

6   actually <u>is</u> in the provision at issue), IBM in its motion slyly substituted the defined term

7   "Limited Use," that is indisputably <u>not</u> in the provision at issue.  MTD at 12:19-24.  It is this

8   term, "Limited Use," that is the sole basis for IBM's assertion that it was entitled to engage in any

9   use or distribution of Actuate software that is "in conjunction with contemporaneous use of

10   Maximo."  MTD at 12:8-11.  IBM does not offer any rationale as to why its out-of-context

11   importation of a separately defined term, which is used only once and in the main body of the

12   agreement, into the "Acquisition or Merger" section, which is an Exhibit, is justified, and it

13   certainly offers no support for its bizarre contention that the License Agreement "unambiguously"

14   requires that one so materially alter the meaning of the agreement from the words that actually

15   appear on the page.

16   For IBM contends that this word substitution results in a profoundly material change to

17   the contract language as written.  If "limited" is given its common English meaning, as precedent

18   and principles of contract construction require,[6] then Section 9 of Exhibit A means that IBM, as

19   acquirer of MRO, can distribute Actuate's software only in "the MAXIMO family of products as

20   they exist today (June 30, 2006) … and their Natural Successors."  Wade Decl., Ex. A (License

21   Agreement, Amendment No. 4).  The parties to this litigation would then conduct discovery as to

22   whether IBM owes additional royalties under the post-acquisition payment formula set forth in

23

24   _____

[5] The term "Limited Use" does appear elsewhere in the License Agreement in an entirely different context – to qualify the terms on which MRO may distribute Actuate's software to its ultimate customers ("End Users").  The License Agreement provides that MRO may provide the licensed Actuate software to End Users for "Limited Use," meaning that the Actuate software provided to its customers must be incorporated into the specified MRO products and not on a stand-alone basis.  See License Agreement ¶¶ 1.2, 1.4, 1.8, 7.3. Nothing in the License Agreement suggests that this term is intended to govern or expand post-acquisition distribution rights.

[6] The words in a contract are to be understood in their ordinary and popular sense absent a special definition.  *California Union Ins. Co. v. Am. Diversified Sav. Bank,* 948 F.2d 556, 560 (9th Cir. 1991); Cal. Civ. Code § 1644; *Tigue v. Commercial Life Ins. Co.,* 631 N.Y.S.2d 974, 974-975 (1995).

1    Section 9.  IBM does not suggest in its motion that if "limited" were given its natural meaning in

2    this section, dismissal would be appropriate.

3         Instead, IBM proposes to swap in "Limited Use" for "Limited" in Section 9, which IBM

4    contends has the effect of permitting IBM to freely distribute as much Actuate software as it

5    wishes to anyone IBM wishes without payment to Actuate, so long as the distribution is "in

6    conjunction with the contemporaneous use of Maximo."  MTD at 12:10-11.  IBM's proposed

7    construction, however, rests upon a tortured and unsupportable reading of the License Agreement.

8    Not only does it import "Limited Use" into a section where the term does not appear, but it

9    eviscerates numerous other provisions of the License Agreement that set limits on an acquiror's

10   distribution right and establish post-acquisition payment obligations.  For example, the parties

11   crafted with some detail the definition of "Natural Successor" products that an acquiror of MRO

12   would be permitted to distribute, but IBM effectively seeks to discard this limitation in favor of

13   nearly boundless acquiror distribution rights.  Similarly, the parties set forth an elaborate formula

14   requiring additional license payments should an acquiring party derive additional revenue from

15   products that include Actuate software.  IBM, however, proposes that it should be absolved of

16   any payment obligations, regardless of how much revenue it derives from products containing

17   Actuate software, and regardless of whether its Tivoli product actually qualifies as a "Natural

18   Successor" to the licensed MRO products.

19        IBM's proposed reading is not only a completely implausible interpretation of anything

20   that Actuate would have considered agreeing to from a business perspective, but flies in the face

21   of the axiomatic principle of contract construction requiring one to "look to the agreement's

22   language in context and construe each provision in a manner consistent with the whole such that

23   none is rendered nugatory."  *Dupree v. Homan Professional Counseling Centers,* 572 F.3d 1094,

24   1097 (9th Cir. 2009); *see* Cal. Civ. Code. § 1641 ("The whole of a contract is to be taken

25   together, so as to give effect to every part, if reasonably practicable, each clause helping to

26   interpret the other."); Cal. Code Civ. Proc. § 1858 ("where there are several provisions or

27   particulars, such a construction is, if possible, to be adopted as will give effect to all.");

28   *Westmoreland Coal Co. v. Entech, Inc.,* 794 N.E.2d 667, 670 (N.Y. 2003) ("A written contract

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.") (internal citations omitted).[7] And, by demanding that the undefined term "Limited" mean something other than "limited," IBM asks the Court to further disregard established principles of contract interpretation requiring that, absent a contrary definition, words should be given their common meaning. *California Union Ins. Co.,* 948 F.2d at 560 ("words of a contract. . . . 'are to be understood in their ordinary and popular sense'") (citing Cal. Civ. Code § 1644); *see also* Cal. Civ. Code § 1638 ("[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"); *Tigue,* 631 N.Y.S.2d at 974-975 ("Where the language of a contract is clear and unambiguous, interpretation of that contract and construction of its provisions are a question of law. . . the court must ascertain the intent of the parties from the plain meaning of the language employed, giving terms their plain, ordinary, popular and non-technical meanings.") (internal citations omitted).  Neither contract language nor law nor common sense can justify IBM's extraordinary request.  Moreover, a motion on the pleadings is clearly not the appropriate mechanism by which to rewrite the parties' written agreement; at the very least, if IBM wishes to put forth a reading that is so at odds with the terms of the contract, Actuate should be permitted adequate discovery to determine whether there is any legitimate basis for such a maneuver.

In sum, Actuate has alleged that there was a contract, under which Actuate has performed, whose terms limit an acquiror's distribution rights following an acquisition to certain MRO products and their "Natural Successors."  Actuate has further alleged that IBM's Tivoli software is not a "Natural Successor" of the licensed MRO product that would be authorized for distribution by IBM without additional payment, and that IBM has failed to pay the substantial sums owed under the License Agreement and its amendments on account of IBM's vast distributions of Actuate's software via Tivoli.  These allegations solidly fall within the pleading standards for contract claims.  *See ACS Recovery Services, Inc. v. Kaplan*, 2010 WL 144816

---

[7] While the License Agreement specifies that New York law is to apply, as to the bedrock principles of contract construction at issue here, there is no difference between California and New York law.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   (N.D. Cal. Jan. 11, 2010) (elements of a cause of action for breach of contract include (1)

2   existence of a contract; (2) performance by plaintiff; (3) defendant's breach; and (4) damages); *JP*

3   *Morgan Chase v. J.H. Elec. of New York, Inc.,* 2010 WL 190425, at *1 (N.Y.A.D. 2 Dep't

4   January 19, 2010) (same).  Under any rational reading of the contract as written, and certainly

5   given the pleading standards as construed by courts in this circuit, Actuate has stated a cognizable

6   breach of contract claim.  *See, e.g. Balistreri, supra,* 901 F.2d at 699.  Accordingly, IBM's

7   motion to dismiss Actuate's contract claim should be denied.

8         **D.**    **SHOULD THE COURT FIND THAT ACTUATE'S COMPLAINT DOES**
                  **NOT SATISFY THE REQUIREMENTS OF RULE 12(B)(6), ACTUATE**

9                 **SHOULD BE GRANTED LEAVE TO AMEND**

10

11        As set forth above, IBM has stated no legitimate basis for the dismissal of any of

12  Actuate's claims.  However, in the event that the Court finds that any of Actuate's claims fail to

13  state a cause of action pursuant to Rule 12(b)(6), Actuate respectfully requests leave to amend its

14  Complaint.  *See, e.g., Balistreri,* 901 F.2d at 701 (noting that leave to amend should be granted if

15  it appears at all possible that the plaintiff can correct the defect).

16  **VI.**    **CONCLUSION**

17        Actuate respectfully requests that the Court deny Defendants' Motion to Dismiss

18  Actuate's Complaint in its entirety.  In the event that any claim should be dismissed, Actuate

19  requests leave to amend.

20

21  Dated:  February  12, 2010          FENWICK & WEST LLP

22

23                                          By:       ***/s/ Rodger R. Cole***

24                                              Rodger R. Cole

25                         Attorneys for Plaintiff
                           ACTUATE CORPORATION

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW